## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**KENNETH ANDERSON-BEY**, *et al.*,          )
                                             )
    **Plaintiffs,**                        )
                                             )
    **v.**                                )          **Civil Action No. 00-2000 (RCL)**
                                             )
**DISTRICT OF COLUMBIA**, *et al.*           )
                                             )
    **Defendants.**                       )
_____              )

## MEMORANDUM OPINION

Before the Court is defendants' Motion [77 & 80] to Dismiss or for Summary Judgment. In this class action lawsuit a class of prisoners who were incarcerated by the District of Columbia Department of Corrections ("D.O.C.") allege that D.O.C. officers violated their constitutional rights under the First and Eighth Amendments, and committed common law torts, while transporting the prisoners between correctional facilities in Ohio and Virginia in 1999. The defendants – the District of Columbia and the individual guards – have moved to dismiss for failure to state a claim, or, in the alternative, for summary judgment. Having considered matters outside the pleadings, the Court treats the motion as one for summary judgment.

Upon consideration of the motion, the memorandum in support, the opposition and the reply thereto, the stipulations between the parties, and the entire record herein, the motion is denied as to the District of Columbia. As to the individual defendants, the Court holds that plaintiffs have adequately alleged that they violated the prisoners' constitutional rights. The Court tentatively concludes, however, that the individual defendants are entitled to qualified immunity on the Eighth Amendment claims, on the basis that the Eighth Amendment rights in

1

question were not clearly established at the time.  Since this issue has not been briefed by the

parties, the Court orders that plaintiffs shall either voluntarily dismiss the individual defendants,

or shall file within 10 days of this date a memorandum of points and authorities explaining why

the individual defendants are not entitled to qualified immunity.  The Court's reasoning is

explained more fully below.

## I.      STANDARD ON SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, a court grants summary judgment only when

the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record

disclose no genuine issues of material fact and show that the moving party is entitled to judgment

as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The movant

initially bears the burden of demonstrating the absence of a genuine, material fact issue.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A disputed issue of material fact is genuine

and thus precludes summary judgment where the Court determines that a reasonable jury could

conceivably find in favor of the non-moving party on that fact issue.  *Anderson*, 477 U.S. at 248.

A court generally must "assume the truth of all statements proffered by the party opposing

summary judgment" and construe all evidence in favor of the non-moving party.  *Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  *See Anderson* at 255; *Carter v. Greenspan*, 304 F.

Supp. 2d 13, 21 (D.D.C. 2004).  Indeed, the Court must "draw all reasonable inferences in favor

of the nonmoving party, and it may not make credibility determinations or weigh the evidence."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  *See also Washington Post*

*Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

In addition to the affidavits submitted on behalf of plaintiffs, the parties have stipulated as

follows: "Each plaintiff class representative in his interrogatory answers verified under oath the truth of those allegations in plaintiffs' First Amended Complaint that the complaint indicates are within his personal knowledge."  Stipulation [84].  The First Amended Complaint is, for the most part, therefore treated as a verified complaint.

## II.  FACTUAL BACKGROUND

Plaintiffs are a class of District of Columbia criminal convicts who were transported from a prison in Youngstown, Ohio to one in Waverly, Virginia in 1999.  First Amended Complaint [27] ("1AC") ¶ 1.  The prisoners were transported by bus in two groups; one traveled on February 15-16, 1999, in a trip alleged to last at least 15 hours, while the other group traveled on March 1-2, 1999, in a trip that allegedly took 10 or more hours.  The prisoners were, at all relevant times, being held under the custody of the District of Columbia.  They were incarcerated in facilities in other states because of the District's practice of contracting with other states for prison space, due to space shortages in the District's facilities.

Plaintiffs allege that the defendant District of Columbia, through its Department of Corrections ("D.O.C."), as well as the individual defendants, who are or were D.O.C. corrections officers, were responsible for the bus transports from Youngstown.[1]  The named class representatives in this case had participated in a class action lawsuit against Corrections Corporation of America, the private company that ran the Northeast Ohio Correctional Facility at

---

[1]The parties have stipulated that the persons who participated in the transportation of the prisoners were employees of the District of Columbia acting under color of law and within the scope of their employment.

Youngstown.[2]  The suit challenged prison conditions at Youngstown.  Because the District of

Columbia housed prisoners in the Youngstown prison, the suit had received some publicity in the

Washington, D.C. area.  After the suits were brought, plaintiffs in this case were scheduled to be

transferred from the prison at Youngstown to the Sussex II correctional facility in Waverly,

Virginia.

The D.C. guards were responsible for preparing and loading the prisoners on the buses at

Youngstown, transporting them by bus to Sussex II, and unloading them upon arrival.  Plaintiffs

describe each trip as a "ride from hell."  First and foremost, the prisoners allege that the guards

secured their restraints far too tightly.  The prisoners wore handcuffs which were secured with a

"black box," a black device that fits between each hand and provides for a tighter, more rigid,

and presumably more secure restraint.  Apparently, at least some of the plaintiffs also had belly

chains applied – chains that are secured around the waist and then fastened to the handcuffs, thus

limiting a prisoner's range of mobility – and had ankle shackles.

According to the complaint, each prisoner's restraints were applied far too tightly, with

the handcuffs cutting off circulation and digging into and sometimes cutting the skin.  There are

also some complaints about ankle shackles being applied too tightly.  The restraints remained too

tight throughout the trip, despite the prisoners' complaints.  Upon arrival at Sussex, prisoners all

experienced pain and discomfort; several had injuries, ranging from minor ones to serious

injuries requiring ongoing medical attention.  The most common complaint is of bleeding

---

[2]The docket and complaint from the case, which was captioned *Busey v. Corrections Corp.*, and which was brought in the Northern District of Ohio, have been filed in this case, as well as newspaper articles describing the lawsuit and affidavits from individual plaintiffs attesting to their participation in the suit.  *See* docket entries [92], [93], [94], [106].

lacerations around the wrist.

Plaintiffs allege other forms of abuse.  For instance, some were not given food or anything to drink, though meals and drinks had been packed for them at Youngstown.  Factoring in the time between their last meal or drink at Youngstown and their first meal or drink at Sussex II, this meant that some prisoners went as long as 24 hours without food or drink.  Plaintiffs point out that they were not allowed to eat even when the buses stopped so that the guards could eat at fast food restaurants.  Other prisoners were not allowed to use the toilets on the buses, with the result that all plaintiffs complain of experiencing the discomfort of having to restrain themselves from urinating or defecating, and many plaintiffs complain of having actually urinated or defecated on themselves.

Several prisoners also complain that they were not allowed to take prescription medications during the trip, despite requests to do so.[3]  *See, e.g.,* 1AC ¶¶ 42, 45, 46, 53, 56, 58, 67, 73, 76, 79, 83.  Prisoners were denied a range of medications, including those for the treatment of high blood pressure, diabetes, and asthma.  Some of the prisoners who were denied medication reported dizziness and fatigue as a result.  A few prisoners reported more serious effects.  *See id.* ¶ 58 (denial of insulin led to diabetic suffering dizziness and severe headache, then vomiting and losing consciousness); ¶ 64 (denial of anti-seizure medication caused prisoner to lose consciousness twice during trip); ¶ 83 (denial of blood pressure and diabetes medications led prisoner to suffer severe headache and vomit).

Finally, the prisoners allege that they complained many times about each of these

---

[3]For some if not all of the prisoners, the guards had their medications with them on the bus.  *See, e.g.,* 1AC ¶ 83 (prisoner denied medication by guard who was holding it on his person).

conditions.  These complaints and requests were generally met by denials and abusive remarks that referred to the Youngstown lawsuit.  *See, e.g., id.* ¶ 22 ("We have a place for all of y'all that want to sue CCA."); ¶ 23 ("You will have a whole lot to sue about before you get off this bus."); ¶ 24 (in response to complaints about restraints and lack of food, officer said "You sued Ohio, sue me.").  The prisoners allege that they were subjected to this taunting from the time they were picked up at Youngstown until the time they entered Sussex II.

The prisoners brought this class action lawsuit, alleging that the conditions they were subjected to during the transports to Sussex II constituted cruel and unusual punishment in violation of the Eighth Amendment.  They also allege that the guards subjected them to these conditions in retaliation for their participation in the Youngstown suit, a separate violation of their First Amendment rights.  They further assert pendant common law claims for assault and battery, negligence, and intentional infliction of emotional distress.  On June 26, 2002, this Court certified a plaintiffs' class.  *See* Order [35].  The parties have conducted discovery, and have identified a group of class representatives whose liability claims are to be tried first.

## III.  DISCUSSION

## A.   CONSTITUTIONAL CLAIMS

### 1.   IMMUNITY

The District of Columbia has waived its sovereign immunity as to plaintiffs' constitutional claims.  "A municipality, such as the District, may be held liable under Section 1983 when the municipality's 'policy or custom . . . inflicts the injury."  *Smith v. District of Columbia*, 2002 U.S. Dist. LEXIS 27819 at *14, 00-cv-894 (GK) (D.D.C. 2002) (quoting *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978)).  The parties have stipulated that:

If the Court or jury finds that an employee of the District of Columbia (whether a defendant or not) caused or subjected a plaintiff to deprivation of a constitutional right as alleged in the amended complaint, the District of Columbia will be liable to the plaintiff under 42 U.S.C. § 1983 for compensatory damages proximately caused by the deprivation.  (Plaintiff need not present evidence that a District of Columbia custom, policy, or practice, or personal action by a District of Columbia policymaker, caused or subjected plaintiff to the deprivation.)

Stipulation [60] at ¶ 1.  Therefore, the District has agreed that if one of its employees, whether or not named as a defendant in this case, is found to have violated a plaintiff's constitutional rights, the District of Columbia will be liable.[4]

The question remains, however, whether the individual defendants retain a defense of qualified immunity.  "Qualified immunity generally shields State officials from liability for their discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Smith v. District of Columbia*, 2002 U.S. Dist. LEXIS 27819 at *9 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In their answers, defendants raised the qualified immunity defense.  In their summary judgment motion, defendants asserted that plaintiffs' counsel had represented in writing that they intended to dismiss all individual defendants, but had not yet done so.  Mem. in Support, Mot.

---

[4]The District fails to raise any affirmative defenses under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997 *et seq*., which might apply to those plaintiffs who are still prisoners and might impose its exhaustion of administrative remedies and physical injury requirements on their federal claims.  *Id*. at 1997e (a), (e).  *See Porter v. Nussle*, 534 U.S. 516 (2002) (PLRA applies to all conditions of confinement suits, including "single episode" cases).  The exhaustion requirement is an affirmative defense that is waived if not raised in a responsive pleading.  *See Anderson v. XYZ Corr. Health Servs.*, 407 F.3d 674, 677 (4th Cir. 2005) (collecting cases from the seven circuits that have held the exhaustion defense to be waivable); *Jackson v. District of Columbia*, 254 F.3d 262, 267-68 (D.C. Cir. 2001) (suggesting but not holding that exhaustion defense is waivable).  The PLRA's physical injury requirement is worded similarly to the exhaustion requirement, and is thus also waivable.  Any defense defendants might have had under the PLRA is waived.

for Summary Judgment [77] at 2 n.1.  Defendants asserted that "[t]he individual defendants are not moving for dismissal at this time based on immunity, due to counsel's representation of impending dismissal of those defendants."  *Id.*

It is not clear what time defendants' counsel thought would be appropriate for raising the qualified immunity defense, if not in their responsive pleading.  "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Indeed, qualified immunity is an affirmative defense that can be waived if not timely raised.  *Gomez v. Toledo*, 446 U.S. 635 (1980).  Waiver is traditionally defined as "the intentional relinquishment or abandonment of a known right."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  The individual defendants can hardly be said to have intentionally relinquished or abandoned their right to raise this very important defense.  They raised it in their answers and attempted to "reserve" it in their summary judgment motion.  No doubt the failure to fully brief the defense was due in large part to the purported agreement that individual defendants would be voluntarily dismissed.  The qualified immunity defense has not been waived.

As discussed below, the Court finds that plaintiffs have put forward allegations of Eighth Amendment violations sufficient to survive a motion for summary judgment.  After reviewing the applicable case law, however, the Court has reached the tentative conclusion that the rights at issue were not "clearly established" at the time.  But without the benefit of full briefing, the Court cannot at this time reach a definitive conclusion on the qualified immunity question.  Nor would it be prudent to reach a conclusion before the parties have determined whether the individual defendants are to remain in the case at all.  Therefore, the Court orders plaintiffs to

either voluntarily dismiss the individual defendants or brief the qualified immunity issues within 10 days of this date.

## 2.     EIGHTH AMENDMENT CLAIMS

"The unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks omitted).  An infliction of pain that is "without penological justification" is "unnecessary and wanton." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). When it comes to prison conditions, "[t]he Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted).  Conditions of confinement can constitute an Eighth Amendment violation when two elements are present.  The first, objective, element is that the act or omission at issue must be "sufficiently serious," that is, the condition to which the prisoner is subjected must pose a "substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  The second, subjective element goes to the prison official's state of mind: the defendants must have "acted with deliberate indifference to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (internal quotation omitted).  The requisite scienter may be inferred where the risk of harm is obvious. *Id.* at 738; *Farmer* at 842.

*Hope v. Pelzer*, 536 U.S. 730 (2002) is controlling in this case.  In *Hope* an Alabama inmate was twice shackled to a "hitching post," once for two hours and once for seven hours, both times as punishment for misbehavior.[5]  This punishment produced "strain . . . on inmates'

---

[5]The hitching post was described as "a horizontal bar made of sturdy, nonflexible material, placed between 45 and 57 inches from the ground.  Inmates are handcuffed to the hitching post in a standing position and remain standing the entire time they are placed on the

muscles by forcing them to remain in a standing position with their arms raised in a stationary position for a long period of time," and the handcuffs "cut into [the inmate's] wrists, causing pain and discomfort." *Hope* at 734, 735 n.2.  The second time the inmate was chained to the hitching post for seven hours, shirtless as the sun burned his skin, with no bathroom breaks and at most one or two servings of water.  *Id.* at 735.  A guard taunted the inmate about his thirst by giving water to some dogs, then bringing the water cooler closer to the inmate and tipping it over, spilling its contents to the ground.  *Id.*

The Supreme Court held that these conditions constituted an "obvious," "clear violation" of the Eighth Amendment.  *Id.* at 738, 741.  The Court held that "[d]espite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation."  *Id.* at 738.  In the eyes of the Court, the gratuitous infliction of pain caused by the hitching post was sufficient for an Eighth Amendment claim, and the lack of proper clothing, water, and bathroom breaks simply exacerbated the situation.  *Id.* at 746-47.

*Hope* is directly applicable to this case.  Here the plaintiffs argue that they were forced to wear restraints that were too tight and which inhibited circulation, limited mobility, and cut into their wrists, causing discomfort, pain, and injury that was more than *de minimis*, and that they were forced to wear these restraints for prolonged periods of time.  The District of Columbia has

---

post.  Most inmates are shackled to the hitching post with their two hands relatively close together and at face level."  *Hope*, 536 U.S. at 733 n.1 (internal quotation marks omitted).

argued that the conduct of the guards on the Youngstown transports was penologically justified by the need to ensure that the prisoners were transported in a manner that was safe for the inmates, the guards, and the community at large, and that this distinguishes this case from *Hope*. But plaintiffs here have alleged that their restraints were secured more tightly than usual, causing greater pain than was necessary to ensure they were securely restrained. The District of Columbia disputes several of plaintiffs' factual allegations regarding the tightness of restraints or the severity of plaintiffs' injuries. These factual disputes are precisely the kind the Court cannot resolve on a summary judgment motion.

Having succeeded on the first prong, plaintiffs have also pleaded facts sufficient to establish deliberate indifference on the part of defendants, at the very least. First, as set forth in *Hope*, deliberate indifference can be inferred where the risk of harm is obvious, and the use of painful, uncomfortable shackles for prolonged periods of time creates an obvious risk of harm. Second, the prisoners allege that they repeatedly brought their discomfort to the attention of the guards and that many prisoners were visibly bleeding at the wrists. The guards were thus put on notice that the prisoners' condition put them in substantial risk of serious harm. Third, plaintiffs allege that the guards acted not just with deliberate indifference, but with the wanton intention of causing pain. Plaintiffs have submitted evidence of an intent to inflict pain in the form of the guards' comments before and during the bus rides, as well as the allegation that on both trips, some guards removed or covered their name tags to conceal their identities. *See* 1AC ¶ 26.

Following *Hope*, the Court will allow plaintiffs to go forward with evidence of the other alleged deprivations. The *Hope* Court emphasized that the hitching post constituted a stand-alone claim, but was willing to consider the deprivation of water, adequate clothing, and

bathroom breaks as additional factors that further exacerbated the inmate's pain and discomfort. Because this Court holds that plaintiffs have stated Eighth Amendment claims based on the nature of their restraints, it holds that, like the inmate in *Hope*, they also may present evidence of the other conditions to which they were allegedly subjected, specifically the denial of food, water, medication, and toilets.

This is not to say that these conditions, by themselves, would necessarily be sufficient to state Eighth Amendment claims.  For instance, it is doubtful whether plaintiffs have pleaded facts establishing that the denial of medication for a limited time period constituted the denial of medical treatment despite a known "excessive risk to an inmate's health and safety," required to state an Eighth Amendment claim for the denial of medical care, and they do not show the requisite substantial harm.  *Arnold v. Moore*, 980 F.Supp. 28, 34 (D.D.C. 1997).  *See also Estelle v. Gamble*, 429 U.S. 97 (1976) (no Eighth Amendment claim stated where, prison officials, *inter alia*, inadvertently failed to fill prisoner's prescription for blood pressure medication for four days); *Glover v. Ridley*, 1994 U.S. Dist. LEXIS 1031, 93-cv-492 (SSH) (D.D.C. 1994) at *5 (failure to provide the drug AZT on one occasion "clearly fail[s] to meet the deliberate indifference standard"); *Cox v. District of Columbia*, 834 F.Supp. 439 (D.D.C. 1992) (two-week delay in providing medication to prisoner insufficient to state Eighth Amendment claim); *Bryan v. Administrative of F.C.I. Otisville*, 897 F.Supp. 134 (S.D.N.Y. 1995) (objective prong not met where prisoner was deprived of medicine for three days, causing fever and mouth infection); *Shapley v. Nevada*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam) (a "delay in medical treatment must have caused substantial harm" to constitute Eighth Amendment violation).

Likewise, the denial of food during a bus ride lasting some ten to fifteen hours is

12

insufficiently serious to state a stand-alone claim, especially since plaintiffs have failed to identify any serious harm suffered as a result.  *See, e.g., Caldwell v. Caesar*, 150 F.Supp. 2d 50, 65 (D.D.C. 2001) (to state Eighth Amendment claim for deprivation of adequate diet, prisoner must allege that deprivation was "so lacking in nutrition on sufficient occasions as to deprive him of adequate food necessary to maintain his health"); *Gardner v. Beale*, 780 F.Supp. 1073 (E.D. Va. 1991) (no Eighth Amendment claim stated where prisoner was fed two meals a day for multiple days, with 18-hour gap between meals, but received adequate nutrition and suffered only mental anguish).  Nor is it likely that the denial of bathroom breaks during the trip, without more, would constitute cruel and unusual punishment.  *See, e.g., Cunningham v. Eyman*, 17 Fed. Appx. 449, 452 (7th Cir. 2001) (no Eighth Amendment claim stated where shackled prisoner forced to soil self); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (temporary deprivation of toilet paper insufficient to state Eighth Amendment claim).

The Court's reliance on *Hope* in determining that plaintiffs state Eighth Amendment claims is significant.  The fundamental inquiry in *Hope* was whether the defendant officers, who had violated the inmate's Eighth Amendment rights, were entitled to qualified immunity nonetheless.  The Court noted that qualified immunity "operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Hope* at 739 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  This does not mean that conduct is shielded by immunity unless the precise acts in question have been held unlawful, but it does mean that "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 650 (1987).  The Supreme Court in *Hope* emphasized that the fundamental requirement is that officers have "fair warning" that their conduct is unlawful. *Hope* at 741.

13

The *Hope* Court held that the officers had fair warning that the use of the hitching post was unlawful because a prior Eleventh Circuit case found it unconstitutional to shackle prisoners to fences or cells for long periods of time, forcing them to sustain uncomfortable and awkward positions, *id*. at 742 (citing *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981)), and because the reasoning, though not the holding, of another case suggested that prolonged deprivation of water, inflicted solely as punishment, might be violative of the Eighth Amendment. *Id.* at 743 (citing *Ort v. White*, 813 F.2d 318 (11th Cir. 1987)). The fair warning was "buttressed" by an Alabama Department of Corrections regulation and a letter from the United States Justice Department regarding the constitutionality of the hitching post. *Id.* at 743-48.

*Hope* was not decided until 2002, two years after the events at issue here. That case obviously did not provide fair warning to defendants, nor did the authority on which it relied, which was not binding in the District of Columbia. The Court has reviewed cases in this circuit and come to the tentative conclusion that the Eighth Amendment rights that were allegedly violated here were not clearly established in the District of Columbia prior to *Hope*. It should be noted that the *Hope* Court also seemed to take account of the "obvious cruelty inherent" in the hitching post punishment, which treated the inmate "in a way antithetical to human dignity," and considered this a separate factor that contributed to defendants' fair warning. *Hope* at 745. The Court will not express an opinion as to whether the cruelty inflicted on plaintiffs was so obvious as to provide fair warning in and of itself, other than to note that some defendants allegedly removed or obscured their name tags, a sign that they themselves thought their conduct to be illegal. Because there is some doubt as to whether the parties intend for the individual defendants to remain in the case, and because the immunity issues have not been briefed, the

Court will order the plaintiffs to either voluntarily dismiss the individual defendants or to file a

memorandum of points and authorities on the qualified immunity issue within 10 days.

### 3.     FIRST AMENDMENT RETALIATION CLAIMS

Plaintiffs also allege that the conditions on the bus rides were imposed by the guards in

retaliation for the prisoners' participation in the Youngstown class action.  "Within the prison

context, a viable claim of First Amendment retaliation entails five basic elements: (1) An

assertion that a state actor took some adverse action against an inmate (2) because of (3) that

prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

*Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citation omitted).

Plaintiffs have submitted affidavits and other evidence showing that they were

participants in the Youngstown class action lawsuit, and litigation is a protected speech activity.

*California Motor Transportation Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  "Prison

walls do not form a barrier separating prison inmates from the protections of the Constitution,"

and prisoners retain the right of access to the courts and to "the constitutional right to petition the

government for redress of grievances."  *Turner v. Safely*, 482 U.S. 78, 84 (1987).

Plaintiffs have also presented evidence of a causal nexus between their protected speech

and the alleged retaliation by the D.O.C. guards.  They allege that numerous guards made

remarks about the Youngstown suit, taunting them about it and referring to it while denying their

requests for food, water, medicine, or toilets, or while ignoring their pleas to loosen their

restraints.  Defendants deny that these remarks were made or that defendants even knew about

the Youngstown suit or the identities of the parties to it.  On the other hand, plaintiffs have

submitted newspaper articles showing that the lawsuit was well publicized and that D.C. D.O.C.

officials were aware of it and were embarrassed by it.  Of course, plaintiffs also contend that

defendants evidenced their knowledge of the lawsuit by specifically referring to it.  These are the

types of factual issues that must be resolved at trial.

Next, plaintiffs must show that the retaliatory action was sufficiently severe that it would

threaten a chilling effect on further exercise of protected activity, in other words that the

retaliation was of a magnitude "likely to deter a person of ordinary firmness from that exercise."

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002).  The alleged retaliatory

conduct certainly qualifies.  The guards are alleged to have applied restraints in a manner

calculated to cause discomfort and pain for the several hours the trips lasted.  In addition, the

denial of benefits that would otherwise generally be available, such as food, water, the timely

dispensation of medicine, and toilets, also constitute acts of retaliation.  *See Crawford-El v.*

*Britton*, 523 U.S. 574, 589 n.10 (1998).  It is obvious that the application of painful restraints for

a prolonged period of time could have the effect of deterring a reasonable person from engaging

in litigation in the future.

For both the First and Eighth Amendment claims, defendants contend that any conditions

imposed on the prisoners were justified by valid penological needs.  It is true that "when a prison

regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Defendants in this case point only to the general need to maintain safe, orderly buses

during the transfer process.  It is quite conceivable that this need might entail reasonable limits

on access to food, water, medicine, and toilets.  But defendants have not articulated any

16

penological justification that requires the blanket denial of those necessities.  Indeed, the

evidence indicates that it was D.O.C. policy to allow access to food, water, medicine, and toilets,

within reason and in accord with certain procedures designed to maintain order and ensure safety.

Similarly, the process of transporting dozens of criminals might require the use of handcuffs or

other restraints.  But plaintiffs have presented evidence, including deposition testimony by

certain individual defendants, that supports their contention that their restraints were applied

more tightly than is normal, in violation of D.O.C. policy, and in a manner calculated to inflict

pain.  Defendants have not identified a specific, legitimate penological objective to which the

conditions on the buses were reasonably related.

**B.      COMMON LAW CLAIMS**

**1.      Compliance with Notice Statute**

Plaintiffs also assert common law tort claims for assault and battery, intentional infliction

of emotional distress,[6] and negligence, which fall under this Court's supplemental jurisdiction.

In its answer, but not in its summary judgment papers, the District asserted the affirmative

defense that plaintiffs' claims are barred for failure to comply with the notice requirements of the

D.C. Code, which states that:

An action may not be maintained against the District of Columbia for unliquidated damages to
person or property unless, within six months after the injury or damage was sustained, the
claimant, his agent, or attorney has given notice in writing to the Mayor of the District of
Columbia of the approximate time, place, cause, and consequences of the injury or damage.  A
report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient
under this section.  D.C. Code § 12-309.

This provision does not apply to constitutional or other federal claims, *Brown v. United*

---

[6]Which they style "outrageous conduct."

17

*States*, 742 F.2d 1498 (D.C. Cir. 1984); *Felder v. Casey*, 487 U.S. 131, 144-45 (1958) (state notice statutes do not apply to federal claims), and applies only to claims against the District, not against individual defendants.  *George v. Dade*, 769 A.2d 760 (D.C. 2001).  In this case, plaintiffs sent a letter to the Director of the D.C. Department of Corrections on June 11, 1999, less than six months after the events at issue, outlining in considerable detail the plaintiffs' allegations about the bus rides and signaling the possibility of litigation.  1AC ¶ 99.  The Court need not determine whether this letter – which was not sent to the Mayor, as required by the statute – constituted adequate notice, because defendants have continued to litigate this case without reiterating the notice defense, and without raising it in the instant summary judgment motion.  The notice defense is thus waived.  *Sanders v. District of Columbia*, 2002 U.S. Dist. LEXIS 6818 at *3, (97-cv-2938) (PLF) (D.D.C. Apr. 15, 2002) (where District of Columbia had litigated case for four years despite fact that plaintiffs had filed notice with Chief of Police instead of Mayor, defense of inadequate notice was waived).

### 2.      Choice of Law

Plaintiffs do not identify which state or states supply the rules of decision for these torts, and defendants do not address choice of law issues.  From the evidence before the Court, it is clear that tortious conduct allegedly occurred in Ohio, Virginia, and the unspecified states through which the buses passed.  From the list of conceivable states whose law might apply in whole or in part, the Court does not detect any significant conflicts of law with the laws of the forum, the District of Columbia.  In the absence of a conflict, a court may apply the laws of the forum.  *In re Air Crash Disaster*, 559 F.Supp. 333, 342 n.10 (D.D.C. 1983).

To the extent there are any conflicts of law, District of Columbia law would still apply.

The courts of the District apply "governmental interest analysis" to resolve choice of law questions. *Hercules & Co., Ltd. v. Shama Restaurant Corp*., 566 A.2d 31, 40-41 (D.C. 1989).  In doing so, they rely on section 145 of the Restatement of the Laws (Second), Conflict of Laws, which holds that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties."  Restat. 2d of Conflict of Laws, § 145.  Principles to consider include the place where injury occurred; where the tortious conduct occurred; where the parties have their domiciles, residences, nationalities, or place of incorporation or business; or where the relationship between the parties "is centered."  *Id.*  Where the conduct complained of and the injury both occur in the same state, that state's law will usually control, but the purpose of the governmental interest analysis is to allow for those cases in which "some other state has a more significant relationship" such that its laws should govern.  *Id.* at § 146.  *See also* Restat. 2d of Conflict of Laws § 6 (describing principles to be considered in applying governmental interest analysis); *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31 (D.C. 1989) (applying D.C. choice of law analysis); *In re Air Crash Disaster*, 559 F.Supp. 333 (D.D.C. 1983) (same).

In this case the "most significant relationship" is with the District of Columbia.  Plaintiffs are D.C. prisoners suing the District and its agents.  They were in the physical custody of the District at the time of the events giving rise to this suit.  The District has a strong interest in applying its tort law to a case where D.C. prison officials are interacting with D.C. prisoners, who are being held pursuant to the sentences of D.C. courts.  Other states through which the transport buses passed have a limited interest in applying their own tort law to these unique facts, in which the parties were isolated in buses and had no contact with these states other than

physical presence.  The reality is that many D.C. prisoners, and most who are serving long terms, are held in facilities outside the District, due to the limited capacity of the District's facilities. The District has a strong interest in ensuring that its agents cannot escape D.C.'s tort law by the expedient of moving prisoners to facilities in another state.  The Court will apply D.C. law to the common law claims.  *See Smith v. District of Columbia*, 2002 U.S. Dist. LEXIS 27819 at *23-29 (D.D.C. 2002) (under governmental interest analysis, applying District law to tort claims of victim who was injured in Maryland, but who was held in the juvenile custody of the District and injured by entities based in the District).

### 3.    Tort Claims

In their motion for summary judgment, defendants failed to specifically address plaintiffs' common law claims.  The Court has evaluated them and has determined that plaintiffs allege sufficient facts to survive summary judgment.

### a.    Assault and Battery

Assault is the "intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim."  *Etheridge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 955 & n.15 (D.C. 1979)).  A battery "is an intentional act that causes a harmful or offensive bodily contact."  *Id.* (quoting *Jackson*, 412 A.2d at 955); *see also Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978) (battery requires showing of "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it," and successful plaintiff may recover "at least [] nominal damages as well as [] compensation for mental suffering, including fright, shame and mortification."); Restat. 2d Torts §§ 18, 21.

As alleged in this case, the intentional application of restraints in a manner intended to cause discomfort is a battery.  Several of the alleged verbal threats made by the D.C. guards could also be found to be assault.

### b.    Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress has three elements: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984). The tort reaches conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a 'civilized community.'" *Kaiser v. United States*, 761 F.Supp. 150, 156 (D.D.C. 1991) (quoting Restat. 2d of Torts § 46, cmt. d at 73).  *See also Ridgewells Caterer, Inc. v. Nelson*, 688 F.Supp. 760, 764 (D.D.C. 1988) (summarizing elements of tort under D.C. law); *Estate of Underwood v. Nat'l Credit Union Admin.*, 665 A.2d 621, 642 (D.C. 1995) (same); *Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C. 1988) (same); *Waldon v. Covington*, 415 A.2d 1070 (D.C. 1980) (same).

Plaintiffs have alleged that they were subjected to outrageous conduct causing severe distress throughout the bus rides.  The application of extremely uncomfortable and painful shackles for several hours, exacerbated by taunting, threats, and the denial of food, water, medicine, and toilets, add up to conduct that a jury could deem outrageous.  Plaintiffs also allege, less specifically, physical and mental symptoms that lingered beyond the ride, including, in at least two instances, the need for mental health services.  They also allege that this distress was inflicted intentionally by defendants, or at the very least, with the kind of deliberate indifference that has been equated to recklessness, in the criminal sense.

### c.      Negligence

Negligence is the breach of a legally cognizable duty that proximately causes injury to another.  *See Beckford v. United States*, 950 F.Supp. 4, 7 (D.D.C. 1997) (summarizing D.C. law of negligence).  In the District of Columbia the uniform standard of care is one of reasonable care under the circumstances.  *Id.* (citing  *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. 1983)).  By pointing to standard D.O.C. practices and written policies that set forth the typical practices to be followed during bus transports like the ones at issue, plaintiffs have articulated a standard of care for the application of restraints and for access to food, water, medicine, and toilets, and they have alleged that the guards failed to meet this standard.  While a failure to comply with D.O.C.'s standard practices or written policies would not establish negligence *per se*, it is evidence of unreasonableness sufficient to defeat summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, the motion for summary judgment is denied as to defendant District of Columbia.  The Court will order plaintiffs to either voluntarily dismiss the remaining individual defendants, or submit within 10 days of this date a memorandum of points and authorities arguing why the claims against them should not be dismissed on qualified immunity grounds.  An appropriate order shall issue this day.

Signed by United States District Judge Royce C. Lamberth, December 11, 2006.